ERNEST ARON, Appellant, v. FLORENCE GILLMAN et al:, as Administratrices D. B. N. of the Estate of DORA OSTROFF, Deceased, Respondents.

Argued April 11, 1955; decided July 8, 1955.

*Orrin G. Judd, Frank Kreitzberg* and *Irwin M. Rosenthal* for appellant. I. Disallowance of Federal and State taxes in computing book value was inequitable, contrary to the terms of the contract, and without warrant in law. (*Atwater & Co.* v. *Panama R. R. Co.*, 246 N. Y. 519; *Benvenuto* v. *Rodriguez*, 279 App. Div. 162; *Sanitary Farm Dairies* v. *Gammel*, 195 F. 2d 106; *Fawcus Mach. Co.* v. *United States*, 282 U. S. 375; *Citizens Hotel Co.* v. *Commissioner of Internal Revenue*, 127 F. 2d 229; *Commissioner of Internal Revenue* v. *Schock, Gusmer & Co.*, 137 F. 2d 750; *Allen* v. *Atlanta Stove Works*, 138 F. 2d 452; *United States* v. *Anderson*, 269 U. S. 422; *Carondelet Bldg. Co.* v. *Fontenot*, 111 F. 2d 267; *Hagan* v. *Dundore*, 187 Md. 430; *Hollister* v. *Fiedler*, 22 N. J. Super. 439; *Elhard* v. *Rott*, 36 N. D. 221; *Gurley* v. *Woodbury*, 177 N. C. 70.) II. Book value of inventory was the only proper measure of value.

*Jacob Krisel, Charles L. Kramer* and *Melvin S. Slade* for respondents.   I. The parties fixed the basis of purchase as *book value.   (Farmers Loan & Trust Co.* v. *Winthrop,* 238 N. Y. 477; *Raleigh Associates* v. *Henry,* 302 N. Y. 467; *Friedman* v. *Handelman,* 300 N. Y. 188; *Matter of Marcus [Macy & Co.],* 273 App. Div. 725, 303 N. Y. 711; *Continental Co.* v. *United States,* 259 U. S. 156.)   II. Book value is assets less liabilities.   *(People ex rel. Knickerbocker Fire Ins. Co.* v. *Coleman,* 107 N. Y. 541; *Lane* v. *Barnard,* 185 App. Div. 754; *Heiner* v. *Mellon,* 304 U. S. 271; *Burnet* v. *Sanford & Brooks Co.,* 282 U. S. 359; *Nichols* v. *Nichols,* 306 N. Y. 490; *Brainard* v. *New York Central R. R. Co.,* 242 N. Y. 125; *Matter of People [Lexington Sur. & Ind. Co.],* 272 N. Y. 210; *Bush* v. *Remington Rand,* 213 F. 2d 456; *Brown* v. *Helvering,* 291 U. S. 193; *Security Mills Co.* v. *Commissioner,* 321 U. S. 281; *Wayne Tit. & Trust Co.* v. *Commissioner of Internal Revenue,* 195 F. 2d 401; *United States* v. *Anderson,* 269 U. S. 422.)   III. This court ordinarily will not review questions of fact.   *(Sadowski* v. *Long Is. R. R. Co.,* 292 N. Y. 448.)

FROESSEL, J.   This appeal turns upon our construction of an agreement between plaintiff and defendants' intestate, Dora Ostroff, which provides that upon the death of one, his or her shares of stock in their jointly owned corporation shall be sold to the survivor " at the book value thereof.   The parties further agree that the book value of said stock *shall be determined by the most recent audit* of the books of the Corporation provided such audit has been made not more than sixty days before the death of such individual.   *   *   *   The payment therefor is to be made in eighteen (18) equal monthly installments ".   (Emphasis supplied.)

Dora Ostroff died on September 21, 1953.   The last previous audit had taken place between August 19th and 21st, less than sixty days prior to her death.   It reflected the corporation's financial position as of July 31, 1953.   Claiming to be no longer bound thereby because plaintiff had breached its terms, Samuel Ostroff, Dora's administrator, refused to perform the stock purchase agreement.   He did, however, offer to buy plaintiff's stock (one third of the total) for $100,000, or to sell to plaintiff his intestate's share (two thirds of the total) for $200,000.   Plaintiff thereupon brought this action in equity for specific performance

against said administrator and, upon the latter's death, the action was continued against his successors, the present administratrices.

Special Term granted specific performance to plaintiff, holding that defendants' claim that plaintiff had breached the agreement " was a mere pretense designed to escape the obligation of a solemn agreement ", that the purchase price (according to the agreement) of the intestate's stock was $186,222.30, to be paid in eighteen equal monthly installments. Cross appeals were taken to the Appellate Division, Second Department, **defendants** complaining of the granting of specific performance and of the provisions for installment payments, and plaintiff contending that the stock's value had been incorrectly determined. The Appellate Division affirmed, one Justice dissenting only as to plaintiff's appeal, agreeing with the latter's contention that the Referee's value of the stock had been incorrect. Only plaintiff has appealed to this court.

As the case now comes before us, only two items — inventory and taxes — are in dispute. How are they to be evaluated under the agreement which describes this method for determining the value of the stock: " book value  *  *  * determined by the most recent audit "? Before discussing them in particular, however, it may be helpful to look more closely at the term " book value " without further definition.

There appears to be no agreement among the decisions or textbook writers on a complete and authoritative definition of the term " book value ". At least two principles seem to emerge from the better reasoned authorities: (1) the book entries must be correct and complete, and not made to defeat an outstanding claim, and (2) accepted accounting principles should not be entirely disregarded (see *Steinbugler* v. *Atwater & Co.*, 289 N. Y. 816). Thus, where interest, which had accrued on notes held by a bank had not been posted on the books and was not yet payable, it was held that the interest should nevertheless be included as an asset in determining book value of the bank's stock (*Elhard* v. *Rott*, 36 N. D. 221). And where the parties were aware that several assets which were listed at substantial sums on the books of a bank had no actual value, it was held that they should be eliminated from the computation of book value (*Gurley* v. *Woodbury*, 177 N. C. 70).

Although when the peculiar asset "good will" has been in issue it has quite consistently been excluded from book value unless actually recorded at some value on the books (see *Lane* v. *Barnard,* 185 App. Div. 754; *Mills* v. *Rich,* 249 Mich. 489; *Succession of Jurisich,* 224 La. 325; *Early* v. *Moor,* 249 Mass. 223), not all unrecorded intangible assets have been so excluded. In *Hollister* v. *Fiedler* (22 N. J. Super. 439), where the book value of stock of an insurance business had been calculated without considering the value of the corporation's expiration and renewal books and records, the court held that such information, of conceded value in the insurance business, should be included in determining the stock's book value; otherwise, according to the court, the result would be inaccurate, inequitable and unintended by the parties to the stock purchase agreement.

So, if abnormal depreciation has been taken on the books for income tax purposes, the court in finding book value may go outside the books and determine a different rate of depreciation (*Hagan* v. *Dundore,* 187 Md. 430). In the last-mentioned case, the court also held that the labor cost invested in outstanding contracts of the corporation should be included in a computation of book value, even though no ledger entries indicated either the amount or value of that labor (see, also, *Rubel* v. *Rubel,* 75 So. 2d 59, 67–68 [Miss.]). And in *Succession of Warren* (162 La. 649), the court held that disputed claims by the government for taxes on the income of previous years should be included as liabilities in determining book value even though the claims might never have to be paid.

In the instant case, the parties have not contented themselves with the mere use of the term "book value", but have themselves defined it, namely, that it should be determined according to the most recent audit of the corporation's books. Webster (New International Dictionary, 2d ed., Unabridged, 1950) defines "audit" as a "formal or official examination and verification of accounts, vouchers and other records", and as "an account as adjusted by auditors". Thus the very purpose of an audit is to verify and reconcile the book entries of a business according to proper accounting practice, and to see that they are accurate.

We now turn to the two specific problems presented in the instant case. First, as to the inventory: Among the current assets listed in the balance sheet of July 31, 1953, is "Merchan-

dise Inventory — Estimated ........ 12,001.15 ''. It will be noted the amount is '' estimated ''. At the trial the accountant testified that this figure was submitted to him by Dora Ostroff, president of the corporation; he did not know the correct figure and did not audit this item. It was conceded by plaintiff, however, that, on July 31, 1953, the actual inventory value amounted to $51,058, nearly $40,000 more. Nevertheless, plaintiff contends that we should take the inventory figure at $12,001.15 simply because it is the figure appearing on the books, and despite the fact that it is concededly erroneous. We are not obliged to follow blindly entries in books that are indisputably untrue. The courts below were therefore correct in holding that the concededly accurate $51,058 inventory figure should be used for determining book value in place of the arbitrary and erroneous guess of $12,001.15 which was supplied to the accountant by the corporation's president.

Second, as to taxes: The audit in question speaks as of July 31, 1953. At the foot of the balance sheet appears the following: '' NOTE: Subject to Federal and State Income Taxes & year-end adjustments.'' The same notation appears at the bottom of the statement of income, profit and loss. And on the schedule of surplus account, net profit for January 1, 1953, to July 31, 1953, is listed at $81,951.20, but this figure is stated to be '' Exclusive of Provision for Federal Income & Excess Profits Tax & New York State Franchise Tax ''.

Plaintiff contends that before book value was determined by the courts below, the indicated provision for State and Federal income taxes should have been deducted. Defendants, on the other hand, insist that no such allowance should be made for income taxes because no figures therefor appear on the books, and because the corporation was not actually liable for taxes on 1953 income until the end of the taxable year — December 31, 1953. The difference, in practical result, is substantial. If the taxes are disregarded, the book value of intestate's stock would be, as the trial court found, $186,222.30 (assuming that the true inventory figure rather than the inaccurate estimate is used), whereas, if both State and Federal income taxes are first deducted, the book value thereof would, we are told, be approximately $132,000 — a difference of over $53,000,

It is well settled that in construing the provisions of a contract we should give due consideration to the circumstances surrounding its execution, to the purpose of the parties in making the contract, and, if possible, we should give to the agreement a fair and reasonable interpretation (3 Corbin on Contracts, pp. 78–79, 88–91, 115; 3 Williston on Contracts, pp. 1780–1788). In the instant case the parties attempted to arrange a method whereby the survivor should buy out the other's interest in the corporation. At the execution of the agreement, no one knew which party would be the survivor, or at what time he would be obliged to purchase. The price was to be book value as determined by the most recent audit; but obviously in such a serious agreement involving the transfer of many thousands of dollars of stock, the parties must have intended by this provision to establish a fairly stable and predictable valuation basis.

The position maintained by defendants, however, namely, a complete ignoring of the income taxes until actually payable, would mean an arbitrary, capricious and widely fluctuating purchase price, depending on the time of the last audit. For example, if that audit took place one day before the taxes became payable, by defendants' theory no income taxes at all should appear in the computation of book value. But if the audit should take place a few days later, book value would have suddenly dropped by an amount equal to the income taxes for the entire year. Such a result is manifestly unreasonable from both a practical and theoretical point of view.

Clearly it makes no sense to charge the entire year's burden of income taxes to the income of the last month preceding termination of the taxable year. On the contrary, sound accounting practice requires that each dollar of income as it is earned throughout the year should bear its proportionate share of the costs of the enterprise, including the tax burden (see *Carondelet Bldg. Co.* v. *Fontenot,* 111 F. 2d 267; *Citizens Hotel Co.* v. *Commissioner,* 127 F. 2d 229; *Commissioner* v. *Schock, Gusmer & Co.,* 137 F. 2d 750; *Allen* v. *Atlanta Stove Works,* 138 F. 2d 452). For this reason interim audits made during the taxable year should include an estimate of the income taxes applicable to the period in question. The mere fact that an item is not yet legally due and payable does not mean that it may be ignored as a liability (*United States* v. *Anderson,* 269 U. S. 422, 440–441; *Fawcus*

*Mach. Co.* v. *United States,* 282 U. S. 375), nor does it mean that the item may not be included in a computation of book value (*Hagan* v. *Dundore,* 187 Md. 430, *supra; Elhard* v. *Rott,* 36 N. D. 221, *supra*).

Moreover, judicially, we must recognize that income taxes are continuing and reasonably predictable charges against corporate income. Their influence pervades modern business. Rare indeed is the corporation or businessman who is not acutely aware of their incidence and effect upon its or his operations. Under such circumstances, to accept defendants' argument that these taxes must be ignored because they were not yet " liabilities " would be to subject our reason to what Mr. Justice Cardozo termed " the tyranny of labels " (*Snyder* v. *Massachusetts,* 291 U. S. 97, 114). If a corporation, such as here, has earned a given net income over the first seven months of its tax year, it is only reasonable that the tax which will be payable on that income should be included in a determination of its financial position in terms of book value. The success or failure of the business thereafter is a risk the purchaser assumes.

In sum, then, the corrected inventory figure, conceded by plaintiff to be accurate, was properly allowed by the courts below. As for the estimated income taxes, they should have been deducted before reaching the final book value figure. The agreement called for book value as determined by audit; the audit, in turn, was expressly made subject to Federal and State income taxes, and prior to the contemplation of any controversy. No question is raised as to the integrity of the accountant who made the audit — indeed, he was selected by defendants' intestate herself. Good accounting practice required an estimation of those taxes for the seven-month period, and, although the actual computations did not appear on the corporate books, those computations should have been made by the trial court and deducted from the corporate earnings prior to determining book value.

Any other result would be unreasonable. It would require plaintiff to pay to defendants over $53,000 extra for the stock, notwithstanding that at the end of the year he would be obligated either to pay out that same amount again in taxes on income attributable to the first seven months of the year, or to account for loss of that income in some other way. In other

words, he would have to pay out an extra $53,000 in order to receive an income tax liability of equal amount. And, to make matters worse, the seriousness of this anomaly would vary tremendously depending upon when the applicable audit had taken place.

Accordingly, the judgment appealed from should be modified so as to take into account the estimated State and Federal income taxes in the computation of book value. In all other respects the judgment should be affirmed, with costs. Since no finding was made below as to what the book value of the stock would be when the inventory is valued at $51,058 and when the estimated taxes applicable to the January 1–July 31 income are included, the case should be remitted to the Supreme Court for computation of that figure.

The judgment of the Appellate Division should be modified in accordance with this opinion and, as so modified, affirmed, with costs.

DESMOND, J. (dissenting). Plaintiff and defendants' intestate, each represented by counsel, and being the owners of all the outstanding stock of a corporation, agreed by a formal written contract: (1) that if either should wish to sell his or her stock while both were alive, the price should be the " *actual value* " as determined by arbitration; but (2) that when either should die, the stockholdings of the deceased should be sold to, and purchased by, the other stockholder at the " *book value of said stock* " to " *be determined by the most recent audit of the books of the Corporation provided such audit has been made not more than sixty days before the death of such* " stockholder. (Italics supplied.) Stockholder Ostroff, defendants' intestate, died on September 21, 1953, about a month after " the most recent audit " and less than sixty days after the date as of which the audit spoke. In this lawsuit the disputes are: first, as to whether the " book value " to be paid to defendants (Miss Ostroff's administrators) should be reduced by the estimated amount of the corporation's accrued Federal and State income taxes; and, second, whether " book value " should include, for inventory, the amount of $12,001.15 shown on the audit, or the amount of $51,058, shown not on the books but by a physical-count inventory made after Miss Ostroff's death.

In every New York case we have found, the bare phrase " book value " has been taken and defined to mean what it is popularly supposed to mean, that is, the assets shown on the books less the liabilities shown on the books (*People ex rel. Knickerbocker Fire Ins. Co. v. Coleman,* 107 N. Y. 541, 543; *Steinbugler v. Atwater & Co.,* 289 N. Y. 816; *Cabble v. Cabble,* 111 App. Div. 426, 430 *Lane v. Barnard,* 185 App. Div. 754, 758). Book value " is reached by estimating all the assets as they appear upon the corporate books, and deducting all the liabilities and other mat ters required to be deducted by law " (*Coleman* opinion, *supra* pp. 543–544). As tersely put in White on New York Corpora tions (Vol. 7, § 7.26): " Book value means the value of the stock as shown on the books of the corporation. * * * Book value is determined by deducting liabilities from assets." With that settled, we turn to the two items here in dispute: that is taxes and inventory.

The latest audit contained no liability figure for income taxes which could not, of course, be computed accurately until the year ended. However, the report of audit contained a note that the figures were " Subject to Federal and State Income Taxes & year-end adjustments ". While, by such an audit, those taxes were not, in the fullest sense, " determined ", nevertheless, the note, apparently made as a routine accounting practice, showed that the auditor (and the corporation) considered that its ne worth was lessened by accrued income taxes. Of course, the final amount of those taxes, dependent on future months' earn ings and losses, could not be fixed until the end of the year However, they could be estimated. We, therefore, consider i reasonable to say that the " book value " of this corporation according to the " most recent audit ", necessarily involved deduction for the estimated amount of taxes to become due o business already done.

As to inventory, the audit stated the value thereof as " Esti mated .......... $12,001.15 ", a figure submitted to the account ant at the time of the audit, by Miss Ostroff, the president, whose estate is now insisting that the larger figure of $51,058 be use because a post-death inventory produced that latter figure. W think that, in the absence of fraud or mathematical error, th book figure was the one to use. These parties, taking thei chances as to which should die first, chose to make book value

as shown on the latest audit, the measure of price. It is entirely beside the point that the use of such figures turned out to be "unfair" to one or the other. As our courts long ago noted, a sale at book value is always "unfair" in the sense that book value, as to a going concern, is always more or less than, never equal to, actual or market value (*People ex rel. Knickerbocker Fire Ins. Co.* v. *Coleman,* 107 N. Y. 541, 544; *supra*; *Cabble* v. *Cabble,* 111 App. Div. 426, 430, *supra*). This corporation took inventory at intervals but had no running or continuous inventory. When the auditor came around, Miss Ostroff gave him an estimate of inventory and he put it on the books. At the trial, plaintiff's counsel conceded that the actual figure, after Miss Ostroff's death, was much higher than the book figure, but such a concession could not change the contract's test of "book value" as determined by latest audit. If, despite such a contract, there has to be a new physical inventory, and, likewise, a new, true valuation of every other asset and liability, then the phrase "book value" has no meaning and the convenient arrangements carefully worked out by the parties and their counsel in the written agreement comes to naught.

I have found no case where the New York courts have failed to carry out such an agreement according to its precise terms (see *Drucklieb* v. *Sam H. Harris, Inc.,* 209 N. Y. 211, and Surrogate Griffith's opinion in *Estate of Reben,* 115 N. Y. S. 2d 228, 237). In *Steinbugler* v. *Atwater & Co.* (289 N. Y. 816, *supra*), when the "book value" was computed, it was found that stocks (in other corporations) owned by defendant Atwater were on the Atwater books at cost, which was concededly much higher than actual value. Atwater's accountant then attempted to write these values down, but the courts, including this court, refused to permit it. So the cost figures stood although, like the inventory value here, they were "concededly erroneous" in the sense that they did not represent actuality.

The judgment should be modified accordingly, without costs.

Conway, Ch. J., Dye, Van Voorhis and Burke, JJ., concur with Froessel, J.; Desmond, J., dissents in part in an opinion in which Fuld, J., concurs.

Judgment accordingly.