JAMES P. DOWDLE, Appellant, v. JOHN M. RICHARDS, as Executor of DAVID RICHARDS, Deceased, Respondent.

Fourth Department, November 14, 1956.

*Clifford H. Searl* for appellant.

*Philip T. Seymour* for respondent.

WHEELER, J. This appeal is from a judgment of the Supreme Court, granting defendant's motion for summary judgment and dismissing plaintiff's complaint.

The plaintiff-appellant, James P. Dowdle, in this action is seeking specific performance of an option agreement for the purchase of certain shares of stock, contained in a contract entered into in 1925 by the plaintiff, David Richards, and J. Milsom Richards.

These three individuals were the organizers of a corporation engaged in the business of outdoor advertising and known as the Richards Adv. Co., Inc. David and Milsom Richards were brothers, living and carrying on the business of this company in Syracuse; the plaintiff Dowdle was a resident of White Plains and was less active in the business.

At the time the Richards Adv. Co., Inc., was organized in 1925, the plaintiff was the owner of 408 shares, David Richards, 409 shares, and the younger brother, Milsom Richards, 233 shares. There were also 200 additional shares, a portion of which was held in the company treasury. The three parties continued to own the same number of shares until 1955, when David Richards died.

The contract in question had for its objective, as therein stated, a plan of distribution of the shares of each of these parties in the event of the death of any of the parties, or upon the prior sale of said shares, the specific language being that

the parties " desire to enter into an agreement wherein and whereby in case of the death of any of the parties hereto or prior sale of said shares that the distribution of their shares of stock in said corporation shall have been previously settled by this agreement ".

The particular portion of the contract under which this plaintiff is seeking specific performance of an option to purchase from the estate of David Richards 117 shares of the stock of said company owned by decedent at the time of his death, is as follows: " 1. That in case of the death of said David Richards, he hereby gives to said James P. Dowdle, an option to purchase, at a price to be determined as hereinafter set forth, sufficient shares to give him, the said James P. Dowdle, including the shares he previously held in said corporation, the same number of shares as owned, *and to be owned through the exercise of this option, by J. Milsom Richards* in said corporation, *and an option to the said J. Milsom Richards of the balance* of the shares in said corporation owned by the said David Richards, the intention being, in such an event, that the said James P. Dowdle and the said J. Milsom Richards *shall each own the same number of shares in said corporation if and when the said James P. Dowdle exercises this option.*" (Emphasis supplied.)

It now appears that when David Richards died he left a will, by the terms of which Milsom Richards, as sole residuary legatee, became entitled to the 409 shares owned by the former. In the light of this fact, there was, of course, no reason why Milsom should exercise the option to purchase the " balance " of the shares, as provided in paragraph 1 of the contract. In fact, Milsom has not exercised that option, but, on the contrary, has specifically waived and renounced his right so to do.

Paragraph 2 assumed the death of Milsom Richards. In that event he gave to the survivors an option on all his stock, they acquiring " the right to purchase shares of sufficient amount so that the said David Richards and James P. Dowdle shall each own with the shares previously owned by each, the same number of shares in the said corporation, provided each elects to exercise this option."

By paragraph 3, in case of Dowdle's death, he gave to the Richards brothers an option on all his stock, each to have the right to purchase one half.

Paragraph 6, pertaining to *inter vivos* sales, provided that " the parties not selling shall have the right to purchase on the same terms and conditions from the party proposing to sell, the shares offered for sale or any part of them ". We may note here that, while the Special Term referred to the agreement as creat-

ing a "first option", only paragraph 6 was a first refusal agreement, and paragraph 1, with which we are here concerned, clearly embodied an absolute option to purchase (*Sandberg* v. *Reilly*, 223 App. Div. 57, affd. 250 N. Y. 547; *R. I. Realty Co.* v. *Terrell*, 254 N. Y. 121).

Paragraph 9 provided that the agreement should bind the executors, administrators, heirs, devisees, assigns and legal representatives of the parties, and that notice thereof should be typed upon the stock certificates.

In the first place, we must remember that " defendant in order to be entitled to summary judgment had the burden to establish that the construction which it seeks to put upon the words and expressions used in the [contract] is the only construction which can fairly be placed thereon " (*Utica Carting, Stor. & Contr. Co.* v. *World Fire & Mar. Ins. Co.*, 277 App. Div. 483, 488; *Piedmont Hotel Co.* v. *Nettleton Co.*, 263 N. Y. 25, 29), and, second, that " in construing the provisions of a contract we should give due consideration to the circumstances surrounding its execution, to the purpose of the parties in making the contract, and, if possible, we should give to the agreement a fair and reasonable interpretation." (*Aron* v. *Gillman*, 309 N. Y. 157, 163.) We believe that application of those principles to this case requires a reversal.

Plaintiff argues that the option agreement entitles him to purchase 117 of the shares in the Richards estate. He claims that the agreement contemplates a division or splitting up of those shares in such a way that the survivors' interests would thereafter be equal. The figure 117 when added to plaintiff's previous holding (408) equals Milsom Richards' holding (233) plus the balance of the shares remaining in the estate, which balance Milsom was granted an option to purchase by paragraph 1 of the agreement. The defendant, on the other hand, contends that the case presents only " a simple problem in arithmetic." He says that the option entitles plaintiff to purchase " the same number of shares as owned [233], and to be owned through the exercise of this option, by J. Milsom Richards ", and that since Milsom has repudiated his option he will acquire no additional shares in that way; therefore, plaintiff has a right to purchase no shares since he already has more than Milsom. In our opinion, such a construction would satisfy neither the purpose nor the language of the agreement.

One of the purposes of the agreement was, in case of the death of either of the Richards, to equalize the holdings of the survivors, or at least make possible such a result. Paragraph 1 states: " the intention being, in such an event, that the said

James P. Dowdle and the said J. Milsom Richards shall each own the same number of shares in said corporation if and when the said James P. Dowdle exercises this option ". Paragraph 2 states: " so that the said David Richards and James P. Dowdle shall each own with the shares previously owned by each, the same number of shares in the said corporation *provided each elects to exercise this option* ". (Emphasis supplied.) In paragraph 1 we do not find such specific words as these but, on the contrary, that paragraph provides that Milsom's option is to acquire the " balance of the shares in said corporation owned by the said David Richards ". Paragraph 3 provides that in case of the death of the plaintiff Dowdle, each of the Richards brothers could take one half of his shares. Since their holdings were already uneven, it is apparent that no one thought it was important to equalize their interests in case of Dowdle's death. But as long as Dowdle was alive, equalization was the theme. He was the " outsider ", unrelated to those who were actively conducting the business, and the agreement was intended in large part for his protection. It is significant that the first option mentioned therein was granted to him. Equally significant is the express statement of the parties' intention that, if the option agreement worked out as they expected it would, Dowdle and Milsom Richards would " each own the same number of shares ". This expressed purpose of equalization will be fulfilled only if plaintiff's construction of paragraph 1 is accepted. He would then have an option to purchase sufficient of the estate shares so that his total holdings would be one half of all the shares owned by the parties at the time of David Richards' death; Milsom Richards would then have an option on the " balance ", and if he exercised it, then " in such event " he and plaintiff would " each own the same number of shares ". On the other hand, if defendant's interpretation of the agreement is correct, then there will be no equalization. For all the option agreements have to do with it, the parties' interests will remain the same as if there had never been any such agreements. Since plaintiff had more stock than Milsom at the time the agreement was drawn, the agreement conferred no right upon the former at that time; nor did he thereafter acquire such a right because the holdings of all three parties remained unchanged until David's death. By defendant's construction, therefore, the agreement commences with a provision which at the time was entirely illusory and which never came into effect in the next 30 years because it was designed to cover a contingency — Milsom's acquisition of more stock than owned by plaintiff — which never occurred. As written, the option granted to plaintiff would

seem to be absolute, subject to no such condition or contingency, and none should be implied, particularly when to do so would frustrate the avowed purpose of the agreement — to equalize the holdings of the survivors by the exercise of options to purchase, in proportions necessary to achieve that result, the shares of the decedent.

Another purpose of agreements of this sort is to preserve control of the corporation in the hands of the parties, so that control or even a substantial voice in the management will not be acquired by persons whose experience or judgment is not to be trusted. But if the executor correctly reads the contract now in issue, the plaintiff is powerless to prevent such a result. The stock might well have been bequeathed to a widow or minor children. In that event, although the agreement was specifically made binding upon heirs, devisees and assigns, and although notice of its existence was required to be indorsed upon the certificates, the legatees could acquire the decedent's entire interest free from interference by plaintiff. For the corporation, that might well be a disaster, but plaintiff, armed with his worthless " option ", could not prevent it. Of course, as events probably not foreseen in 1925 have since worked out, it seems likely that David's stock will not go to outsiders but will pass to his brother as residuary legatee. But that result may be equally undesirable from plaintiff's view, for Milsom Richards would then be a majority stockholder firmly entrenched in management, and plaintiff's position would not be a strong one. It was presumably to give him some real protection against just such eventualities that paragraph 1 was included in the agreement, conferring upon the survivors the opportunity, if they chose to use it, of preserving control within the original group and at the same time adjusting their interests upon the basis of equality so that neither would be at the mercy of the other.

So it seems that defendant's construction would entirely frustrate the twin purposes of the agreement, and when we turn to its language, that conclusion is strengthened. Paragraph 1 states unqualifiedly that David Richards " *hereby gives to said James P. Dowdle* " and the question is, " gives " what? Something or nothing? By defendant's construction, nothing was given and nothing received, except an illusory right which could not become of any practical significance unless the respective interests of Dowdle and Milsom Richards were radically altered. As we have said, there is no reason for burdening plaintiff's option with any such unexpressed contingency. The contract then continues, " an option to purchase." It certainly requires no citation of authority to say that it is for the optionee to deter-

mine whether the option shall be exercised, and, if he elects to do so, he may enforce it, regardless of the wishes of anyone else. By defendant's construction, however, plaintiff's option was dependent upon the prior exercise of defendant's option. If the latter decided to purchase so many estate shares that he owned more stock than plaintiff, then plaintiff could " catch up "—no more. On the other hand, if defendant chose not to exercise his option at all, or exercised it only to the extent of 175 shares or less, then Dowdle had no right to purchase any shares from the estate. That is not much of an " option ". If another party to the contract, being vitally interested in the corporation and the distribution of its stock, by his inaction or limited action could defeat the option given to plaintiff in clear and unmistakable terms, then plaintiff acquired nothing from an agreement intended for his benefit, and the word " option " was used in a very inaccurate sense. It is of the very essence of an option that the party owning it may in his sole discretion elect to exercise it, independently of the will of another; and while an option may undoubtedly be made conditional, conditions should not be implied without reason, and never when they annul the purpose of the agreement itself.

The agreement then provides that the option shall extend to the purchase of " *sufficient shares* " to give Dowdle, counting the shares he already had, " *the same number of shares as owned, and to be owned through the exercise of this option, by J. Milsom Richards* ". There is no dispute about the number of shares " owned " by Milsom — 233. Defendant contends that the " number of shares  *  *  *  to be owned through the exercise of this option " is zero because he never exercised the option. With that we disagree, because the agreement does not say, " the number of shares Milsom Richards will own if he does not exercise the option "; we already know what that number is — 233 — and it is expressly covered by the preceding words " as owned." Rather, the language in question means " the number of shares Milsom Richards will own if he does exercise the option," the number " to be owned through the exercise [not the nonexercise] of this option." It was clearly contemplated that defendant would exercise his option, and that the interest of David Richards would be consumed by the survivors and not be permitted to fall into the hands of outsiders. This was accomplished by giving to defendant, individually, " *an option  *  *  *  of the balance of the shares in said corporation owned by the said David Richards* ". The use of the word " balance " presupposes that plaintiff has already taken a share so that a balance remains. Milsom Richards could then purchase that

balance — all or none — " *the intention being, in such an event* [i.e., if Milsom Richards exercises his option], that [plaintiff and defendant] *shall each own the same number of shares in said corporation* if and when the said James P. Dowdle exercises this option ". It is contended that Dowdle exercised his option. Milsom Richards could then have elected to take the " balance ", as it was contemplated that he naturally would, and " in such an event " the parties would " each own the same number of shares." Their interests would then have been equalized and control retained in the hands of the original group.

It is unclear why plaintiff, whose option was granted first, should have to wait for the prior exercise of defendant's option, which was given last and was expressly limited to acquisition of " the balance." The agreement does not contemplate a piecemeal consumption of the interest of decedent, possibly leaving the estate with a small and unmarketable block of stock. Defendant's option was simply to take " the balance " — all or none. Under defendant's interpretation, however, he could not take all because that would impair plaintiff's right to " catch up ". And if he decided to take none, plaintiff would be powerless to prevent the bulk of decedent's stock from passing to outsiders. The agreement was drawn to prevent just such a result. Its clear purpose and the expressed intention of the parties would so indicate, and the language of paragraph 1 definitely points in the same direction.

While we believe that the interpretation of the contract suggested above is correct, in deciding this motion it is necessary only to find in the agreement an ambiguity which should be resolved upon a trial. Since there are, in addition, other issues — as to the exercise of the option by plaintiff and the extent of the relief to which he is entitled — decision of which must await a trial, it is impossible to grant summary judgment to either party. Therefore, we do not wish to be understood at this time as finally determining the meaning of the agreement as a matter of law.

The judgment and order should be reversed and the motion denied.

All concur. Present — McCurn, P. J., Vaughan, Wheeler, Williams and Bastow, JJ.

Final order and judgment reversed on the law, with costs, and motion denied, with $10 costs.