## (July 14, 1975)

■ JOHN B. BALL et al., Appellants, v JAMAICA SAVINGS BANK, Respondent.—In an action *inter alia* for injunctive relief and reformation of a certain agreement, plaintiffs appeal from a judgment of the Supreme Court, Nassau County, entered June 14, 1974 in favor of defendant, after a nonjury trial. Judgment affirmed, with costs *(Matter of Surrey Strathmore Corp. v Dollar Sav. Bank of N. Y.,* 36 NY2d 173). Martuscello, Acting P. J., Cohalan and Christ, JJ., concur; Munder, J., concurs in the result, with the following memorandum: I agree with the majority that *Matter of Surrey Strathmore Corp. v Dollar Sav. Bank of N. Y.* (36 NY2d 173) is not only apposite, but that it is controlling. Further, section 5-601 of the General Obligations Law (L 1974, ch 119, § 2), which requires the payment of interest on mortgage escrow accounts at rates to be fixed by the banking board, has substantially corrected any disparity in the relative bargaining positions of the parties to any mortgage on any one-family to six-family residence occupied by the owner and located within the State. This new law applies to any existing mortgage, except where the mortgage expressly provides that no interest is to be paid on the escrow account. A challenge to the constitutionality of section 5-601 of the General Obligations Law, made by the defendant herein, was recently rejected by a three-Judge Federal District Court *(Jamaica Sav. Bank v Lefkowitz,* 390 F Supp 1357). As the *Surrey Strathmore* case *(supra)* suggests, we should not judicially vary the terms of the mortgage agreement, especially in the light of the recent legislation. Shapiro, J., dissents in part and votes to modify the judgment by deleting so much of the said judgment as dismissed the first cause of action and substituting therefor a provision granting plaintiffs judgment on that cause of action, with the following memorandum: The plaintiff mortgagors appeal from a judgment which dismissed their complaint after a nonjury trial in an action (1) for an accounting and restitution by the mortgagee-bank-defendant for the economic time value of allegedly excessive balances which it required plaintiffs to maintain in a noninterest-bearing escrow account since the inception of a mortgage loan, (2) for an injunction restraining defendant from continuing to require plaintiffs to maintain such excessive balances and (3) because of the bank's usury for a money judgment for twice the interest paid from the inception of the mortgage loan to the date of judgment, "an adjudication that the entire interest due and to become due on the loan is forfeited." I agree with the affirmance by this court of the trial court's dismissal of the usury cause of action *(Brown v Robinson,* 224 NY 301), but for the reasons hereafter stated I believe that plaintiffs are otherwise entitled to the relief they seek. The facts are not disputed—only their legal effect. As a consequence, a somewhat detailed statement of the relationship between the parties seems in order. THE FACTS. On May 6, 1966 the bank issued a commitment to Sagamore Farms, Inc., for 25 mortgage loans on residences to be built in Syosset, Long Island. Part of this agreement required Sagamore to pay 1% of any building loan it received from the bank as an origination fee. On October 19, 1967 plaintiffs contracted with Sagamore to buy one of the residences subject to the bank's commitment. Plaintiffs then applied for and received from the bank a commitment for a $20,000 mortgage loan. On February 28, 1968, Sagamore entered into a building loan agreement for money to finance its construction of the residence plaintiffs had contracted to purchase. Pursuant to that agreement, Sagamore gave the bank a building loan mortgage and its $20,000 promissory

note. On May 24, 1968 plaintiffs and defendant made the mortgage extension agreement which is the subject of this action. Paragraph 10 of that agreement provides as follows: "10. In addition to said payments, and at the sole option of the party of the first part, [the bank], the party of the second part [plaintiffs] shall pay to the party of the first part on the first day of each and every month after the date hereof and until the bond or note extended by this agreement if *[sic]* fully paid, a sum equal to the taxes, assessments and other like charges, plus the premiums on insurance required by the party of the first part, next due and payable on or against said mortgaged premises (all as estimated by the party of the first part) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such premiums, taxes, assessments, and other like charges will become due and payable. Full irrevocable authority is hereby given the party of the first part by the party of the second part to pay such charges out of such escrow. If at any time any premium, tax, assessment, or other charge becomes due and payable and the escrow then on hand is insufficient to pay the same, the party of the second part shall pay such deficiency immediately on demand. Any excess over the payments actually made by the party of the first part for such charges, at the option of the party of the first part, *[sic]* be credited either on account of subsequent payments therefor to be made by the party of the second part or be refunded to the then owner of the property according to the party of the first part's records at the time of making such refund. On any default under the provisions of this agreement, the party of the first part may, at its option, apply any balance accumulated under this paragraph as a credit against the amount of principal then remaining unpaid under said bond or note." As part of the closing on May 24, 1968, the bank's attorney prepared and presented to plaintiffs a document entitled "mortgage escrow closing statement". Plaintiffs paid the amount called for in this statement by check. There was no discussion of the payment and plaintiffs made no objection to the payments required under the document or to any provision of the mortgage agreement. Plaintiff John Ball, an attorney specializing in corporation and government contract work, testified that he scanned paragraph 10 of the mortgage agreement and knew that its general purpose dealt with tax payments, but he did not read it over to make any determination as to the method in which calculations were to be made. Approximately two years and eight months later, John Ball, in a letter dated February 16, 1971 addressed to the bank's president, complained that the monthly escrow payment required by the bank resulted in an average escrow balance of approximately $535 being kept by the bank in the noninterest-bearing escrow account "presumably for the remaining 27½ year life of the mortgage". He asserted that the resulting economic detriment was completely unacceptable to him and his wife, the other plaintiff. He also stated that "the governing mortgage instrument does not provide for constant monthly payment of fixed amounts into the escrow account at all" but only "that the Bank, at its option, may demand that the mortgagor pay monthly varying amounts * * * of '* * * a sum equal to the taxes * * * next due and payable * * * less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such * * * taxes * * * will become due and payable'." The bank, in explaining how it computed the payments into the escrow fund required by it of plaintiffs said: "In February of each year the defendant [bank] makes computations based upon the town tax bill for the then current year and the school tax bill for the fiscal year beginning on the provious *[sic]* July 1st. The defendant

divides the amount of the first half of the said town tax by 6 and divides * * * the first half of the said school tax by 6. If at that time no deficit exists, the quotients resulting from these divisions are added together and the sum becomes the amount of the monthly payment. The defendant determines whether or not a deficit exists in the following manner. At the time of the making of said computation, the defendant requires that there be in the account a sum equal to ⅔ths of the said town tax and ⅚ths of the said school tax and the defendant also requires that there be in the account a reserve for an insurance premium in the amount of $67.00. If the amount then in the account does not meet the foregoing requirements, ¹⁄₁₂th of the difference between the amount in the account and the amount which would meet the foregoing requirements is added to the sum of the foregoing quotients. The total of all of the foregoing amounts is then rounded out to the nearest even dollar." Thus, it appears that the bank provides for a separate, yet concurrent, accrual of the total school and town taxes, collecting ¹⁄₁₂th of the total of each year's tax every month, timing the collection so that it has the total due for each semiannual installment payment of each tax one month before that semiannual installment payment becomes due under the statute governing the tax. Since the statute does not require payment of the tax until one month and ten days after the tax becomes due, at which time the tax, if unpaid, becomes a lien on the mortgaged property, the bank has the full money it needs to pay the tax installment in its escrow account for a total of 70 days before it must actually pay it out. Because the first half of the town tax is actually payable on February 10, the first half of the school tax on May 10, the second half of the town tax on August 10, and the second half of the school tax on November 10, all without default, the result of the bank's collection formula is that there is always in its escrow account a balance which includes the entire semiannual town or school tax due *plus at least (but usually more than) one half of the other semiannual tax thereafter to be paid.*[1] At the trial, the bank admitted (1) that it used that method of computing the amounts which it collected monthly from plaintiffs for the escrow fund and (2) that it commingled the moneys in plaintiffs' escrow fund with those it collected from all its

---

1.

| Date | First Half Town Tax *Due Jan. 1 *Paid Feb. 10 | First Half School Tax Due April 1 Paid May 10 | Second Half Town Tax Due July 1 Paid Aug. 10 | Second Half School Tax Due Oct. 1 Paid Nov. 10 |
|---|---|---|---|---|
| Jan. 1 | Entire tax | 4/6 | 1/6 | — |
| Feb. 1 | Entire Tax | 5/6 | 2/6 | — |
| March 1 | — | Entire tax | 3/6 | — |
| April 1 | — | Entire tax | 4/6 | 1/6 |
| May 1 | — | Entire tax | 5/6 | 2/6 |
| June 1 | — | — | Entire tax | 3/6 |
| July 1 | 1/6 | — | Entire tax | 4/6 |
| Aug. 1 | 2/6 | — | Entire tax | 5/6 |
| Sept. 1 | 3/6 | — | — | Entire tax |
| Oct. 1 | 4/6 | 1/6 | — | Entire tax |
| Nov. 1 | 5/6 | 2/6 | — | Entire tax |
| Dec. 1 | Entire tax | 3/6 | — | — |

*The "due" dates listed above are the dates the tax installments become liens and the "paid" dates are the dates on which the Bank pays the tax under its standard procedure.

other mortgagors and utilized those moneys, as it did the funds in its savings deposits, for loan and investment purposes to earn income *for the bank.* The first question to be determined is whether the method used by the bank to collect sufficient funds in plaintiffs' escrow account to pay the taxes due on the mortgaged property accords with the language of paragraph 10. *Was the bank's action in completing collection of a sum sufficient to pay each of the semiannual installments of the town and school tax on a date two months and 10 days prior to the date on which such installment had to be paid over by it to the particular governmental agency involved* beyond the rights given to it by the provision of the mortgage requiring plaintiffs to pay to it "on the first day of each and every month after the date hereof [May 24, 1968] and until the bond or note extended by this agreement if *[sic]* fully paid, a sum equal to the taxes * * * next due and payable on or against the said mortgaged premises * * * less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such * * * taxes * * * will become due and payable" (emphasis supplied)? To put the question another way, do the words "due and payable" mean the day on which the tax installment must be paid to avoid the imposition of a tax lien on the mortgaged property (the day on which the bank actually made payment of each tax installment) or the day on which the statute governing the tax declares it to be due and payable, that being the first date on which the taxpayer may make payment of the tax, if he wishes? I believe it to be the former, and that when the bank reads that phrase as granting it the option to insist on plaintiffs paying the full amount of the tax installment coming due some 70 days prior to the time when the bank actually pays it, it is reading into the language a power not given it in the mortgage agreement. Before detailing my reasons for reaching this conclusion, I will first deal with a second issue between plaintiffs and the bank; that is the meaning of the phrase in paragraph 10 which gives the bank the option to require plaintiffs to pay to it "on the first day of each and every month after the date" of the mortgage agreement "a sum equal to the taxes * * * *next due and payable* on or against the said mortgaged premises" (emphasis supplied). The bank treated each of the two real property taxes, town and school, as separate and different. It therefore collected one sixth of its estimate of the next semiannual installment of each tax next due on the first of the month next after it had completed collection of the full total of the prior semiannual installment. Thus it would, as it completed collection of the full total of the semiannual installment of one tax, also already have collected in the escrow account one half (³⁄₆ths) of the total amount due on the next installment of the other tax. If, however, the language in paragraph 10 permitted it to collect only the total of the tax "next due and payable", it would be permitted to collect from plaintiffs for taxes each month merely one third of the total of the semiannual installment of whichever tax was next due and payable. If that procedure were followed, the bank would have in its possession the full amount of that installment one month before it became due and payable and, when it paid out that amount on the last payment date, it would in the meantime have collected in its escrow account, as the next monthly payment, one half of the semiannual tax installment of the other tax next becoming due and payable. The net effect of such a pattern of computing and collecting would be to reduce substantially the average balance remaining in the escrow account, thus resulting in the bank's having available in its pooled mortgagors' escrow accounts a far smaller amount of their funds for it to put to use as loan and investment funds for its own profit. It is my

view that, as is the case with the other phrase in paragraph 10 discussed in the preceding portion of this memorandum, the interpretation set forth above is the one which accords with the ordinary understanding of the phrase "taxes * * * next due and payable" and is the one plaintiffs are entitled to have applied. To sanction the procedure used by the bank would require the assumption that in order to protect it against the creation of a possible prior tax lien, and to secure it against the mortgagors' default in payment of taxes, assessments or insurance premiums, the mortgagors, out of the goodness of their hearts, elected to yield up to the bank the use of substantial amounts of their money, knowing that the bank would use those moneys to enhance its own income. Although not writing an opinion, my learned brethren are affirming the judgment below on the authority of *Matter of Surrey Strathmore Corp. v Dollar Sav. Bank of N. Y.* (36 NY2d 173). I do not view that case as apposite. There, a corporate mortgagor, a business corporation which for several years had owned and operated an apartment complex, entered into an agreement with the bank, under which the latter made a $450,000 loan to it, secured by a first mortgage on the apartment complex. In addition to the customary provisions with respect to repayment of principal and interest, the mortgage contained (p 175) what the Court of Appeals characterized as "a now familiar agreement to make installment payments on account of real estate taxes on the mortgaged premises." The clause concerning taxes read in relevant part as follows (p 175): "the mortgagor will pay to the mortgagee on the first day of each month until the said principal sum is fully paid, an installment of the taxes levied or to be levied against said premises. Such installments shall be equal to the estimated taxes next due (as estimated by the mortgagee) less all installments already paid therefor, divided by the number of months that are to elapse before one month prior to the date when such taxes will become due. The mortgagee shall hold such monthly payments in trust to apply the same against such taxes when due". However, in *Surrey Strathmore,* unlike the instant case, the mortgagor's secretary-treasurer, at the closing, inquired about payment of interest on funds in the tax account and was told that interest would *not* be paid. Nevertheless, a month and a half after the closing, the mortgagor requested the bank to hold the tax moneys in a separate interest-bearing account and to credit the mortgagor, at least semiannually, with such interest. When the mortgagee refused, the mortgagor instituted suit for an accounting of the payments received and the income earned. In rejecting the position urged upon it by *Surrey Strathmore,* Judge Jones, writing for the majority of the Court of Appeals, said (p 176): "In the circumstances of the relationship between these parties it does not advance our inquiry into the determination of the rights of the mortgagor or of the obligations of the mortgagee to proceed in reliance on categorical concepts suggested by such labels as 'trust', 'agency', 'escrow', 'debtor-creditor', for it must be evident that the relationship here does not fall essentially under any one of such classical headings or any identifiable combination of them. Reasoning predicated on such concepts would accordingly be untrustworthy. We cannot, for instance, ground any conclusion on the use of the words 'in trust' in this particular mortgage clause. Resolution of the issues must depend rather on what rights and obligations the parties are found to have intended to create as manifested by the words they used in their written agreement, with parol evidence admissible to clarify ambiguities, if any, under recognized canons of construction." After noting that the written expression of the agreement of the parties contained no explicit provision, one way or the other, with respect to payment of interest or

earnings on the tax payments, Judge Jones turned to "relevant parol evidence" to resolve the *ambiguity* left by this omission and found it clear that no payment was intended, citing the undisputed fact that when the mortgagor asked about payment of interest on the tax account he was told "no" by the mortgagee. The majority added (p 178): "The officers of this corporate mortgagor were clearly experienced in real estate financing; contentions that this was a contract of adhesion which might be made were the relative statuses or the relationship of the parties different, are not available. We can only conclude that the mortgage papers in this instance were executed and the proceeds of the loan received without expectation of payments of either interest or earnings." Thus, the determination in *Surrey Strathmore* turned on the fact that, at the closing, the intent of the parties that no interest should be paid was evidenced by their discussion, thus giving meaning to the ambiguous phrase in the mortgage and that the relatively equal bargaining status of the parties did not require the intervention of the court to alter the relationship to which they had agreed. Both of the latter facts are absent in this case. Here, concededly, there was no discussion of the question of how the escrow funds for taxes, insurance premiums and possible assessments would be computed or whether the bank would pay interest on the money accumulated and retained by it in its escrow account. There is nothing to show that plaintiffs had knowledge of, or consented to, either the method of computation of the monthly payments to be used by the bank or to the nonpayment of interest on the substantial monthly balance the bank would require plaintiffs to pay into the escrow account. The trial court stated that one of the plaintiffs "is a lawyer who was admitted to the bar in 1955" and "has *general* knowledge of real estate and loan transactions" (emphasis added). It noted that he "specializes in 'corporation and government contract work' and is 'accustomed to reading corporate documents' which 'are rather involved documents' ." This does not establish that he "was clearly experienced in real estate financing", one of the factors cited by the Court of Appeals in *Surrey Strathmore;* nor can it serve to transform his failure to protest or object to the manner in which the bank computed the amounts to be paid into the escrow account until February, 1971, into a waiver of his rights, as the bank argues in its brief. There is no proof in the record, nor is the contention even urged, that, at the time the mortgage agreement was entered into, plaintiffs had any knowledge of the procedure the bank would use in computing the payments to be placed in the escrow account. Nor can plaintiffs' failure to object to the bank's method of computing the amounts it collected monthly from them for payment into the escrow account, until several years after the closing, be used as a basis for resolving the ambiguities in the contract as to the meaning of "due and payable" and "next due and payable". In this connection, the trial court concluded that the ambiguity "would have to be resolved in accordance with the manner in which the parties acted on the contract", entirely disregarding the fact that there is no proof of when plaintiffs first became aware of how the phrases "due and payable" and "next due and payable" were being interpreted by the bank. Thus, it cannot be said that plaintiffs' reliance upon the bank's computation of the amount to be paid by them into the escrow account monthly was an acceptance of the validity and correctness of the bank's actions under the contract. The cases cited by Special Term in support of its finding that plaintiffs' failure to protest for over two years showed that they had accepted the bank's resolution of the ambiguity are inapposite. In *Sattler v Hallock* (160 NY 291, 301), the court found that the parties to the contract "understood it to

be one of bailment, where the property was to be furnished by the latter, improved by the former, and the net profits divided" and that there was no ambiguity. In *Brooklyn Pub. Lib. v City of New York* (250 NY 495), it was clear that the party seeking to take advantage of the ambiguity in the agreement had, for 20 years, followed a course of reading it in a way contrary to that which it was then seeking to follow. The Court of Appeals properly applied the following rule (p 501): " 'When the parties to a contract of doubtful meaning, guided by self-interest, enforce it for a long time by a consistent and uniform course of conduct, so as to give it a practical meaning, the courts will treat it as having that meaning, even if as an original proposition they might have given it a different one.' *(City of New York v New York City Ry. Co.,* 193 NY 543, 548)." In the instant case, it can hardly be claimed that the bank's *unilateral* computations were knowingly acquiesced in by plaintiffs so as to give the bank's construction of the patently ambiguous phrase one which "the courts will treat as having that meaning". In the third case cited by Special Term, *Taber v First Citizens Bank & Trust Co. of Utica* (247 App Div 580, 587, affd 273 NY 539), the court found no ambiguity in the contract there involved. Here, since the mortgage extension contract form used was that supplied by the bank, the principle of construction which is applicable to resolve the ambiguity is that: "Since one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity of language are resolved in favor of the latter" (4 Williston, Contracts [3d ed], § 621, pp 760–761; see, also, *Raw Silk Trading Co. v Katz,* 201 App Div 713, 716; *Bristol v Cornell Univ.,* 237 App Div 771, 775; *Janos v Peck,* 21 AD2d 529, 533, affd 15 NY2d 509). Under that rule, the interpretation of the ambiguous phrases "due and payable" and "next due and payable" contended for by plaintiffs is the one that should be applied here. Also relevant to this issue is the language in *Surrey Strathmore,* that "contentions that this was a contract of adhesion which might be made were the relative statuses or the relationship of the parties different, are not available" *(Matter of Surrey Strathmore Corp. v Dollar Sav. Bank of N. Y.,* 36 NY2d 173, 178, *supra).* As Williston points out, "Contracts of adhesion, where one of the parties is in a disadvantageous bargaining position because the provisions are standardized and stereotyped, are also narrowly construed against the writer" (4 Williston, Contracts [3d ed], § 626, pp 855–857). Hence, the interpretation of the ambiguous phrases here under consideration should be construed against the bank, the writer of the phrases. Furthermore, here, unlike the situation in *Surrey Strathmore,* there can be no contention that plaintiffs, individual mortgage borrowers, who, under their contract of purchase with the builder, were obligated to deal with this bank as the mortgage lender, had equality of bargaining power with it.[2] Also relevant to the meaning and understanding of the parties of the phrases used in paragraph 10 is the testimony of the bank's president. He admitted that the only purpose for establishment of

2. In the agreement of October 19, 1967 between plaintiffs and the builder, Sagamore Farms, Inc., governing the sale of the home, the subject of the mortgage agreement between them and the bank, plaintiffs had to bind themselves "to make diligent, truthful and proper applications to lending institutions designated by the Seller [Sagamore Farms, Inc.], and without delay to furnish such verifications of banks *[sic]* accounts and employment *[sic]* or any other instruments or information as may be required by said lending institutions in the processing of the Purchaser's applications, for the mortgage loan described above."

the mortgage escrow fund was the protection of the bank's mortgage lien against any possible imposition on the mortgaged real property of a superior tax lien. It is well-settled law that, "In construing a contract, due consideration must be given to the purpose of the parties in making the contract (4 Williston, Contracts [3d ed], § 619, pp 730–733), and wherever possible, the agreement should be given a fair and reasonable interpretation *(Aron v Gillman,* 309 NY 157, 163; *Frank Associates v Ryan & Sons,* 281 App Div 665)." *(Tobin v Union News Co.,* 18 AD2d 243, 245.) In *Farrell Lines v City of New York* (30 NY2d 76, 82), Judge Jasen, speaking for a unanimous court, said, "A lease, like any other contract, is to be interpreted in light of the purposes sought to be attained by the parties." Since the bank conceded that the *only* purpose for its requiring the establishment of the escrow account was to secure its mortgage lien against the imposition on the mortgaged property of a superior tax lien, it seems clear that the parties to the mortgage agreement, or at least plaintiffs, never intended to give the bank the additional benefit of allowing it to maintain a much larger balance in the escrow fund than was needed to prevent impairment of its security, an excess balance which the bank could use, and was using, to obtain income, without any resultant benefit to plaintiffs, whose money it was. Hence, in my opinion the trial court was in error when it dismissed plaintiffs' first cause of action and denied their prayer for relief thereunder. They are entitled to a recovery in terms of the normal savings bank rate of interest on that part of the balance defendant required them to maintain in the escrow account which was in excess of the minimum required under the mortgage agreement to be kept in that account to secure the payment of taxes on the mortgaged property as they became due and payable. Plaintiffs are also entitled to a judgment declaring that the bank, under the language of the extended mortgage agreement, may not, in computing the monthly payments into the escrow account due from them for taxes next due and payable, collect installments for taxes other than the installment next due and payable and, in computing the amount due and when due, use a final date for accumulating the total payment in the escrow account other than one which is one month prior to the last day when the next tax installment is actually due and payable in order to avoid any penalty or the imposition of a tax lien.