In re LA TOYA JACKSON, Debtor.

No. 95–43145 (cb).

United States Bankruptcy Court,
S.D. New York.

Aug. 5, 2010.

Valensi Rose, PLC, Gary F. Torrell, Esq., Los Angeles, CA, Attorneys for Debtor.

Pryor Cashman, LLP, Seth H. Lieberman, Esq., New York, NY, Attorneys for Creditors' Trust.

Wrobel & Schatz, LLP, David C. Wrobel, Esq., New York, NY, Attorneys for Societe Bal du Moulin Rouge.

## MEMORANDUM DECISION DENYING MOTION TO REOPEN CHAPTER 11 CASE AND EXTEND TERM OF CREDITORS' TRUST

JAMES M. PECK, Bankruptcy Judge.

### Introduction

Before the Court is a motion filed by the Trustee of the La Toya Jackson Creditors' Trust (the "Trust"). The motion seeks to reopen the chapter 11 case of La Toya Jackson and extend the term of the Trust beyond its presently scheduled expiration date of March 31, 2011. To date, all distributions from the Trust have been made to administrative expense claimants, and unsecured creditors have not recovered anything on their claims. With the objective of benefiting these creditors, the Trustee requests that the Court order an extension of the term of the Trust, but such an extension would not further the Trust's "liquidating purpose." The Motion is denied for the reasons stated below.

### Relevant Procedural History And Factual Background

The Motion relates to a very old bankruptcy case[1] that was filed more than fifteen years ago. La Toya Jackson (the "Debtor"), a high profile entertainer, commenced the Chapter 11 Case on July 19, 1995. On August 31, 1998, the Court confirmed the Second Amended Plan of Reorganization (the "Plan"),[2] and the Plan became effective over eleven years ago on April 1, 1999. Pursuant to the Plan, the Debtor, the Trustee, and the Debtor's largest unsecured creditor[3] entered into a creditors' trust agreement (the "CTA") providing for the creation of the Trust upon the Plan's effective date. Under the CTA, the Trust's assets included rights to a stream of monthly royalty payments arising from the Debtor's intellectual property as well as potential recoveries related to the Debtor's claims against certain third parties. The CTA also established a distribution scheme governing disbursements from the Trust, requiring the Trustee[4] to distribute proceeds from the Trust to fully satisfy all administrative expense claims[5] before making any distributions to unsecured claimants.[6]

Pursuant to the CTA, the Trust was scheduled to automatically terminate seven years after its creation. CTA § 8.2 ("the [Trust] shall remain in existence until the earlier of (a) seven years after the Effective Date, (b) ... all [claims] have been paid in full ..., or (c) the occurrence of an event of termination ..."). The CTA also contains a provision permitting the Court to extend of the term of the Trust if "the facts and circumstances" demonstrate that *"extension is necessary to the liquidating purpose of the [Trust]"* (emphasis added).[7]

On November 27, 2001, three years into the projected seven year term of the Trust, the Trustee filed a motion seeking, *inter alia,* an extension of the term of the Trust through March 31, 2011.[8] In the First Extension Application, the Trustee argued that "[b]ased on the magnitude of the remaining senior claims payable by the Trust, the Trust's revenue experience to date, the downward trend in annual receipts and the inability to predict future

---

1. Case number 95–43145 (the "Chapter 11 Case"). The Chapter 11 Case was assigned to the Honorable Cornelius Blackshear.

2. *See* Order Confirming Second Amended Plan Of Reorganization, dated August 31, 1998 (ECF Doc. # 322).

3. Societe Bal du Moulin Rouge ("Moulin Rouge"). Moulin Rouge, with a claim in the amount of $500,000, was by far the largest unsecured creditor of the Debtor and was also a chief proponent of the Plan. The total unsecured claims against the Debtor equaled approximately $670,000.

4. The CTA provided for the appointment of attorney Richard Levy, Jr., a partner in the law firm of Pryor Cashman, LLP, to serve as Trustee of the Trust.

5. The total amount of administrative claims equaled approximately $772,283,33. Verified

Amended Motion of the Creditor Trustee of the La Toya Jackson Creditors Trust to (i) Reopen the Chapter 11 Case, (ii) Extend the Term of the Creditor Trust, (iii) Lift the Holdback on Professional Fees, and (iv) Close the Chapter 11 Case, dated April 26, 2010 (ECF Doc. # 410) (the "Motion") ¶ 9.

6. CTA § 4.4.

7. CTA § 8.2.

8. Application for Orders in Connection with the Closing of the Chapter 11 Case: (1) Authorizing an Extension of the Duration of the La Toya Jackson Creditors' Trust; (2) Dismissing Adversary Proceedings; (3) Discontinuing Contempt Proceedings; and (4) Entering a Final Decree and Order Closing the Case Pursuant to Section 350 of the Bankruptcy Code and Bankruptcy Rule 3022, dated November 27, 2001 (ECF Doc. # 402) (the "First Extension Application").

revenues, ... the Trust [will] need more than the remaining duration of the Trust's original term to be in a position to provide a return for general unsecured creditors." [9] The Debtor did not object to the First Extension Application, and no hearing was held on the First Extension Application. On December 28, 2001, an order was entered granting the First Extension Application and extending the term of the Trust for an additional five years beyond its original expiration—to March 31, 2011.[10] That same day, the Court entered a Final Decree and Order closing the Chapter 11 Case.[11]

After the closing of the Chapter 11 Case, the Trustee continued to administer the Trust, liquidate assets, and make distributions of proceeds to administrative claimants on account of their administrative claims.[12] As of December 31, 2009, approximately $4,400 of administrative claims remained unpaid,[13] and the Trustee had not yet made any distributions to the Debtor's unsecured creditors. The only remaining unliquidated claim belonging to the Trust is a claim against Douglas W. Davis, an individual who is currently a chapter 11 debtor in the United States Bankruptcy Court for the Central District of California (the "Davis Claim").[14] In connection with the Davis Claim, the Trust filed a proof of claim in Mr. Davis's chapter 11 case, and the parties have entered into a stipulation that the allowed amount of the Davis Claim is $123,000.[15]

On April 26, 2010, the Trustee filed this Motion to reopen the Chapter 11 Case and extend the term of the Trust for an additional period of not less than five years beyond its current expiration date.[16] On

9. First Extension Application ¶ 15.

10. Order Extending the Duration of the La Toya Jackson Creditors' Trust Created under the Second Amended Plan of Reorganization from March 31, 2001 to and including March 31, 2011, dated December 28, 2001 (ECF Doc. # 406) (the "First Extension Order") at 1–2 ("... the application having been brought before the Court pursuant to a notice of presentment ... and sufficient cause having been shown, ... and it is further ORDERED, that Section 8.2 of the Creditors' Trust Agreement filed with the Court on April 7, 1999, is deemed amended in accordance with this Order.").

11. Final Decree and Order Closing this Chapter 11 Case Pursuant to Section 350 of the Bankruptcy Code and Bankruptcy Rule 3022, dated December 28, 2001 (ECF Doc. # 407).

12. Motion ¶ 14.

13. Request For Judicial Notice In Support Of Debtor's Supplemental Objections To Creditor Trustee's Motion To Extend Term Of Creditor Trust, dated June 10, 2010 (ECF Doc. # 418) (the "Request for Judicial Notice"), Ex. 1 (La Toya Jackson Creditors' Trust Statement of Operations (unaudited) Year ended

December 31, 2009) (the "Statement of Operations") at 2.

14. The Trust actually holds several unpaid outstanding judgments, but has stated it will continue to pursue only the Davis Claim because the enforcement of other judgments would not be cost effective. Statement Of Operations at 3–4 ("The Creditors' Trust ... holds a monetary judgment entered against Douglas W. Davis, Steven Randall Jackson, and/or Steven M. Powers.... With the exception of any value that may be realized by reason of the judgment lien against Mr. Davis'[s] property the Creditors' Trust concluded that further efforts to enforce the judgments it held against Steven Randall Jackson and Steven M. Powers in California would not be cost effective.").

15. Request for Judicial Notice, Ex. 3 (Stipulation For Allowance Of Secured Claim Of Latoya Jackson Creditor's Trust, dated April 13, 2010 in Case No. SV-09-21737-KT) (Bankr. C.D.Ca.) (the "Davis Stipulation") at 11.

16. The Motion also requests that this Court lift a professional fee allowance holdback that was never formally released in the original Chapter 11 Case, and close the Chapter 11 Case.

May 10, 2010, the Debtor objected to the Motion, requesting that the Trust be terminated immediately and that the Court order all Trust assets to revert to the Debtor.[17] On May 18, 2010, the Trustee filed a reply in further support of the Motion.[18] That same day, Moulin Rouge filed a statement in support of the Motion, requesting that the Court extend the Trust for a term of ten years beyond its current expiration date.[19] At a hearing on the Motion on May 20, 2010, the Court requested that the parties submit supplemental briefs as to the meaning of the "liquidating purpose" language in section 8.2 of the CTA. Thereafter, on June 9, 2010, the parties filed supplemental briefs.[20]

### Discussion

■ The term of the Trust may only be extended if the Court determines that such an extension is necessary to the "liquidating purpose" of the Trust. CTA § 8.2. None of the relevant documents defines

the term "liquidating purpose." According to the Trustee, the definition of "liquidating purpose" must necessarily include enhancing the recovery of unsecured creditors because the primary purpose of the Trust is to liquidate assets for distribution to creditors. Trustee Supplemental Brief at 3. The Debtor, however, argues that "liquidating purpose" means the mechanical act of liquidating the amount of existing claims and judgments, *i.e.*, the "[t]he act of determining by agreement or litigation the exact amount of something that was before uncertain." *See* Debtor's Supplemental Objection at 2. Each of these interpretations necessarily comes from a "result oriented" perspective. The Trustee, in particular, submits that the distributive goals of the Trust should influence the meaning of "liquidating purpose." The Court disagrees. The "liquidating purpose" of the Trust is objective—*i.e.*, to liquidate otherwise illiquid assets in the Trust for distribution.

17. Reorganized Debtor's Objections To Motion To (I) Reopen Chapter 11 Case, (II) Extend Term Of Creditor Trust, (III) Lift The Holdback On Professional Fees, And (IV) Close Case, dated May 10, 2010 (ECF Doc. # 414) (the "Objection") ¶ 8.

18. Reply Of The Creditor Trustee In Further Support Of Motion To (I) Reopen The Chapter 11 Case, (II) Extend The Term Of The Creditor Trust, (III) Lift The Holdback On Professional Fees, And (IV) Close The Chapter 11 Case, dated May 18, 2010 (ECF Doc. # 413).

19. Statement in Support of Creditor Trustee's Motion to Reopen Chapter 11 Case and Related Relief, dated May 18, 2010 (ECF Doc. # 416).

20. *See* Supplemental Brief Of The La Toya Jackson Creditor's Trust In Further Support of Its Amended Motion To (I) Reopen The Chapter 11 Case, (II) Extend The Term Of The Creditor Trust, (III) Lift The Holdback On Professional Fees, and (IV) Close The Chapter 11 Case, dated June 9, 2010 (ECF Doc. # 417)

("Trustee Supplemental Brief"); Debtor's Supplemental Objections to Creditor Trustee's Motion to Extend Term of Creditor Trust, dated June 9, 2010 (ECF Doc. # 419) (the "Debtor's Supplemental Objection"). The Debtor has requested that this Court take judicial notice of (a) several factual statements made by the Trustee in the Statement of Operations; (b) the Davis Stipulation; and (c) a factual deduction derived from a synthesis of the Davis Stipulation and the proposed plan filed in the Davis bankruptcy case on Feb. 17, 2010 (the "Proposed Davis Plan"). The Trustee has not objected to the Debtor's request for judicial notice. As an initial matter, the Court recognizes that it may take judicial notice of publicly available documents such as the Davis Stipulation and the Proposed Davis Plan. *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 (9th Cir.2006) (noting that facts contained in public records are considered appropriate subjects of judicial notice). Moreover, the Statement of Operations was filed as Exhibit 2 to the Objection and was properly before the Court at the Hearing.

### A. The Plain Language Of Section 8.2 Of The CTA

A review of commonly used legal dictionaries supports the Court's interpretation of the phrase "liquidating purpose." Black's Law Dictionary defines "liquidation" to mean "the act of determining by agreement or litigation the exact amount of something . . . that was before uncertain."[21] This suggests that the phrase "liquidating purpose" means converting the assets into distributable cash. The Trustee's proffered definition—equivalent to wish fulfillment for unsecured creditors—appears to conflict with the plain meaning of the term.

Other sections of the CTA further support this objective meaning of the term "liquidating purpose." For example, the CTA's statement of purpose extends well beyond simply serving the interests of creditors and defines its purpose as "to hold, manage, protect, administer, sell, liquidate, transfer, prosecute, settle, or otherwise dispose of the [Trust's] Assets."[22] Similarly, the recitals in the CTA indicate that the Trust was formed to liquidate Trust assets and pursue claims as necessary, thereby indicating that generating cash for distribution to creditors is a byproduct of the Trust's "liquidating purpose" and not central to that purpose.[23]

The interpretation proposed by the Trustee relies on an excerpt taken from section 5.1 of the CTA stating that the Trust exists for the "benefit of holders of Allowed Unsecured Claims . . . and to pay the obligations of the [Trust]." CTA § 5.1. A more complete analysis of the entire section confirms that this section informs the Trustee that the "liquidating purpose" should be exercised in the interests of creditors. This is apparent in light of the qualifying language that immediately follows the excerpt cited by the Trustee: "the [Trust] shall not engage in any trade or business or otherwise undertake any activity other than those activities that are reasonably necessary . . . to the liquidation of [Trust] Assets and the distribution of proceeds . . ." CTA § 5.1.

The Court's interpretation dovetails with the manner in which other courts have construed a trust's "liquidating purpose." Other courts have interpreted the words to mean in furtherance of the liquidation of assets, and not to mean the ultimate objective (i.e., distribution to creditors) that results from such a liquidation. See Kwon v. Yun, 2006 WL 416375, *4, 2006 U.S. Dist. LEXIS 7386, at *14 (S.D.N.Y. Feb. 21, 2006) (noting that the "liquidating purpose" of a trust was to "liquat[e] the [trust] assets"); RGH Liquidating Trust v. Deloitte & Touche LLP, 851 N.Y.S.2d 73, 2007 WL 4097413, *2–3, 2007 N.Y. Misc. LEXIS 7682, at *3 (N.Y.Sup.Ct. Nov. 7, 2007) (same). Moreover, this interpretation of the term "liquidating purpose" is consistent with the analysis conducted by this Court in other cases construing similar but not identical language. See, e.g., In re Silicon Graphics, Case No. 06–10977(BRL), Order signed on 10/1/2009 (1) Reopening Chapter 11 Cases; (II) Extending Duration of Trust; (III) Approving Amendment To Liquidating Trust Agreement To Extend Time; and (IV) Closing Chapter 11 Cases,

---

**21.** Black's Law Dictionary (9th ed.2009). According to Merriam Webster, another commonly used dictionary, "liquidation" means "to convert (assets) into cash." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/liquidation (last visited Aug. 4, 2010).

**22.** CTA § 5.4.2.

**23.** CTA Recitals at 2.

(ECF Doc. # 980) (construing trust agreement to permit extension solely for the purpose of facilitating the liquidation of assets); *In re Global Crossing*, Case No. 02–40188(REG), Order Granting Motion of the Global Crossing Estate Representative to Extend the Term of Liquidating Trust, dated July 17, 2008 (ECF Doc. # 4857) (same).

The First Extension Order does not affect the current analysis. The First Extension Application was unopposed and appears not to have been closely considered by the Court. Moreover, the First Extension Application does not directly address the term "liquidating purpose" [24] and is not accompanied by any discussion of the issue now before the Court.

### B. The Trust's "Liquidating Purpose" Is Not Furthered By An Extension Of Its Term With Respect To Debtor's Royalties

█ Because the term "liquidating purpose" is not imbued with meaning relating to the benefits to be derived by creditors, the Trustee must demonstrate that additional time is needed to liquidate claims that remain outstanding. However, the Trustee acknowledges that only one claim remains unliquidated—the Davis Claim.[25] The amount of the Davis Claim is not in dispute, as both the Trustee and Mr. Davis have stipulated that the claim is in the amount of approximately $123,000.[26] Thus, the Trust's recovery on the Davis Claim is largely a function of allowing the Davis bankruptcy case to run its course. In time, the Davis Claim may result in the realization of proceeds for the Trust—*i.e.,* a liquidation of the Davis Claim. To the extent that it is necessary to extend the term of the Trust to prosecute the Davis

Claim and to administer the proceeds of that claim, such an extension for this limited purpose would be consistent with the "liquidating purpose" of the Trust. The rights to La Toya Jackson's royalties fall into a different category.

Undoubtedly the most valuable assets held by the Trust are the rights to receive royalties associated with intellectual property created by La Toya Jackson as an artist and a performer. Her fame is well recognized. The Debtor dedicated to the Trust the right to receive those royalty payments for a term of years, not in perpetuity. That term has been extended once for a total of approximately twelve years, and, to succeed in obtaining a further extension, the Trustee must show that such an extension is necessary to the liquidating purpose of the Trust. In the case of Ms. Jackson's royalties, that is impossible in light of the standard articulated in this decision.

The royalties constitute a passive ongoing revenue stream relating to the exploitation of intellectual property. When compared with the Davis Claim, these assets may be characterized as a predictable, albeit variable, annuity. The Trust's rights to continue holding this property terminate on March 31, 2011 unless it can be shown that an extension fulfills a liquidating purpose. In actuality, an extension in relation to the Debtor's royalties would simply fulfill the purpose of collecting more revenue for creditors beyond any originally foreseeable period for the holding of those assets in the Trust. That may be a desirable goal for creditors, but it is undesirable for the Debtor and not contemplated by the CTA or Debtor's confirmed Plan.

**24.** First Extension Application ¶ 23.

**25.** *See* Statement of Operations at 3–4.

**26.** Davis Stipulation at 5.

### C. The Intent Of The Parties To The CTA Militates Against Extending The Term Of The Trust With Respect To Debtor's Royalties

In light of the fact that the CTA is unambiguous, this Court is bound by its plain text and does not need to consider the intent of the parties to that contract. *Greenfield v. Philles Records*, 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 171 (2002) ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous ... A contract is unambiguous if the language it uses has 'a definite and precise meaning.' ") (citation omitted).[27] Even if the Court were to find ambiguity in the CTA, the intent of the parties clearly militates against extending the term of the Trust with respect to Debtor's royalties. Under New York law, courts endeavoring to identify the intent of parties to an ambiguous contract should consider "the history and education of the parties, the nature of the contract, the purposes of the parties, and all other relevant circumstances." *In re Delta Air Lines, Inc.*, 608 F.3d 139, 145–46 (2d Cir. 2010) (citations and quotations omitted) (contract was ambiguous and court considered parties' intent).

According to the Trustee, the parties to the CTA did not intend to create a Trust that would make distributions solely to administrative claimants and instead contemplated that unsecured creditors would recover at least a portion of their claims. The Trustee relies on the Disclosure Statement[28] which indicates that the parties anticipated administrative fees in the amount of approximately $250,000, not the much greater amount that actually was accumulated.[29] The Disclosure Statement, however, is of limited use to this inquiry. This is so because the parties' expectations of creditor recoveries changed sharply between the date of approval of the Disclosure Statement on October 30, 1997 and Plan confirmation on August 31, 1998. At the hearing on the Disclosure Statement the parties expected administrative expense claims to exceed $250,000,[30] and at that level unsecured creditors might have expected to recover at least some percentage of their claims. But just five months later at the January 30, 1998 confirmation hearing, the parties recognized that the administrative expense claims had ballooned to an amount greater than $645,000.[31]

In fact, contemporaneous statements indicate that the parties to the CTA understood that unsecured creditors might not recover anything at all on their claims. Indeed, at the confirmation hearing, the parties recognized that administrative expense claims would exceed $645,000 but estimated that the Plan might generate only $500,000 for distribution.[32] The rec-

---

27. The CTA provides that it is to be governed by New York law. CTA § 9.6.

28. Amended Disclosure Statement of the First Amended Plan of Reorganization, dated October 30, 1997 (ECF Doc. # 130) (the "Disclosure Statement").

29. *See* Trustee Supplemental Brief at 5; Transcript of May 20, 2010 Hearing at 10:4–7.

30. Disclosure Statement at 15 ("At this time, the amount of [administrative expense] claims is unknown, but is expected to exceed $250,000.").

31. Transcript of January 30, 1998 Confirmation Hearing at 178–79 (ECF Doc. # 199) (The Examiner (now the Trustee) noted that "My fees are roughly $145,000 [and my attorney's fees application is] approximately $200,000 ... [Debtor's counsel has also made a fee application] in excess of $300,000.").

32. *Id.* at 178–79 ("The disclosure statement either specifically or read as a whole, states that the estate expects to receive at the low end, something in excess of $500,000").

ord supports a finding that the parties at the time of confirmation of the Plan anticipated that the total administrative expense claims might be greater than the amount forecast for distribution.

There is no evidence that the parties contemplated possible extensions of the Trust solely to ensure recovery by unsecured creditors. Notably, neither the Disclosure Statement nor the Plan promises any return for unsecured creditors. Instead, the Plan states that "[a]s soon as practicable ... after payment in full of Allowed Administrative Expense Claims and Allowed Priority Claims" the Trust will pay "a Pro Rata portion of the *cash available* for distribution."[33] The parties appear not to have discussed the issue of extending the Trust's term.[34] *See* Debtor's Supplemental Objection ¶ 2 ("One would expect the ... Disclosure Statement, Plan, and Creditors' Trust Agreement to describe any anticipated extension of the term of the Creditors' Trust and why the 'liquidating purpose' of the Creditors' Trust could take longer than seven years. However, those documents contain no such description.").

### D. Equitable Considerations Weigh Against Extending The Term Of The Trust With Respect To Debtor's Royalties

 The Trustee also seeks relief on equitable grounds. However, a court is unable to grant equitable relief in connection with a contract if the plain language of that contract is unambiguous. *Greenfield,* 750 N.Y.S.2d 565, 780 N.E.2d at 171 ("if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity"). Here, the language of section 8.2 is insufficiently broad to enable the Court to exercise discretion to extend the Trust's term based on equitable concerns.[35] Instead, the plain language of the Trust includes a single specific and objective justification for extending the Trust—when necessary to further its "liquidating purpose."

 Even if the Court were to consider such equitable considerations, they do not warrant extension of the term of the Trust. The Trustee argues that the Court should extend the term of the Trust because denying unsecured creditors any recovery on their claims would constitute an inequitable result that violates the central tenet of the Bankruptcy Code of maximizing distributions to creditors. In effect, the Trustee argues that the term of the Trust should be extended because it is good for creditors. That argument misses the point and demonstrates the lack of support for an extension. The Bankruptcy Code's overarching objective is to balance the interests of both creditors and debtors. *See Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (noting that the Bankruptcy Code aims to "provide a procedure by which ... insol-

---

**33.** Plan § 3.3.1.

**34.** *See* Declaration of La Toya Jackson in Support Of Debtor's Supplemental Objection (ECF Doc. # 419) ("To the best of my knowledge and memory, there were no negotiations at any time between me and/or my counsel and either the Plan proponent ... or the Creditor Trustee ... regarding any potential extension of the term of the creditor trust ... I did not intend to permit any additional royalties or other assets ... to be taken from

me for any longer than seven (7) years from the effective date of the Plan ...").

**35.** Other trust agreements analyzed by this Court in other contexts have contained broader language. *See, e.g., In re SK Global Am, Inc.,* Case No. 03–14625(RDD), dated September 4, 2009 (ECF Doc. # 337) (trust language permitted extension "if it is in the best interest of the Beneficiaries").

vent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life' "). For almost twelve years, the Debtor has dedicated the revenue stream from her royalties to the Trust. Having already extended the term of the Trust once before, equitable considerations do not favor a second extension that would further deprive the Debtor of access to this income stream.

According to the Trustee, the Debtor allegedly pursued a scorched-earth litigation strategy during her bankruptcy case aimed at deliberately incurring administrative costs to the detriment of unsecured creditors. That allegation is irrelevant to the question now before the Court. The circumstances leading to the accumulation of administrative expenses could have been dealt with during the period leading up to confirmation of the Plan. The fees constitute allowed administrative claims, and it is too late now to attack the character of those claims.

### Conclusion

The key undefined term in the CTA— "liquidating purpose"—actually defines itself. It contemplates purposeful activities calculated to monetize assets of the Trust, not the goal oriented objectives of doing whatever may be desirable to maximize creditor recoveries in the context of a Plan that was confirmed with knowledge that such recoveries were uncertain. Given the natural meaning of the term and the background of this case predating by many years the appointment of this bankruptcy judge to the bench, the Court concludes that the Trustee has failed to show cause

to reopen this case or to extend the term of the Trust for purposes of continuing to passively collect royalties from property that should revert to the Debtor when the Trust terminates.. To the extent that some extension of the term of the Trust may be needed in order to collect sums related to the Davis Claim, the Court, without reopening the Debtor's case, hereby authorizes the Trustee to take any action that may be needed to complete the administration and processing of that one claim even if such action should be required beyond the current expiration date of the Trust in March, 2011.

**SO ORDERED.**